**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| CHSPSC, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | FILE NO. <u>4:15-cv-133 (CDL)</u> |
| | ) | |
| ST. FRANCIS HOSPITAL, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | **\*\*FILED UNDER SEAL\*\*** |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff CHSPSC LLC ("CHSPSC") brings this action for breach of

contract and fraud against defendant St. Francis Hospital, Inc. ("St. Francis").

## NATURE OF THE ACTION

1.

This action centers on Plaintiff CHSPSC's aborted acquisition of defendant

St. Francis, a hospital in Columbus, Georgia. For the first seven months of 2015,

CHSPSC spent money and time negotiating the proposed acquisition in good faith.

Based on the information St. Francis provided and the representations St. Francis

made, the parties entered a Letter Agreement outlining terms for the acquisition.

Pursuant to the Letter Agreement, CHSPSC made a good-faith initial deposit to St.

Francis of $5 million.

2.

Only after signing the Letter Agreement, paying $5 million, and going through months of costly due diligence did CHSPSC learn that St. Francis had intentionally hidden material facts about the hospital's legal and regulatory problems. St. Francis's deception included repeated misrepresentations and intentional omissions intended to induce CHSPSC into a deal and specifically into fronting St. Francis the $5 million.

3.

When CHSPSC confronted St. Francis about its misrepresentations and failures of disclosure, St. Francis terminated the transaction without cause and without refunding even a penny of CHSPSC's $5 million deposit. CHSPSC now sues St. Francis to recover the $5 million, all costs and expenses CHSPSC incurred throughout the negotiating process, punitive damages, and the fees and expenses of bringing this action.

## PARTIES, JURISDICTION AND VENUE

4.

Plaintiff CHSPSC is a limited liability company incorporated in Delaware that provides management and consulting services to its affiliated hospitals. CHSPSC's principal place of business is in Brentwood, Tennessee.

5.

Defendant St. Francis is a non-profit corporation incorporated in Georgia. St. Francis's principal place of business is located at P.O. Box 7000, Columbus, Georgia 31908-7000.

6.

Because CHSPSC is a limited liability company, its citizenship for diversity purposes is "determined by the citizenship of its members." *Rolling Greens MHP, LP v. Comcast SCH Holdings, LLC*, 374 F.3d 1020, 1022 (11th Cir. 2004). CHSPSC's sole member is CHS/Community Health Systems, Inc., a Delaware corporation with its principal place of business in Tennessee.

7.

Accordingly, this Court possesses subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a)(1). This is a dispute between CHSPSC (a citizen of Delaware and Tennessee) and St. Francis (a citizen of Georgia), and the amount in controversy in this action exceeds the sum or value of $75,000, exclusive of interest and costs.

8.

St. Francis is subject to the personal jurisdiction and venue of this Court pursuant to 28 U.S.C. § 1391. St. Francis may be served with process upon its

registered agent, Richard Bradley, 2122 Manchester Expressway, Muscogee,

Columbus, Georgia 31908-7000.

## FACTS

### *St. Francis Denies Legal or Regulatory Problems During Initial Communications with CHSPSC*

9.

In November, 2014, officials from St. Francis announced that an alleged

"budget inaccuracy" had led to St. Francis misreporting its income.  In a press

release, St. Francis asserted that it would need to restate its financial statements,

but nonetheless announced that the hospital's "underlying fundamentals are good"

and that the hospital was working on a plan for "a sustainable future."

10.

Shortly after St. Francis's announcement, Pier Holcombe, an agent of

CHSPSC, contacted Richard "Bo" Bradley, the Chairman of St. Francis's Board of

Directors, to ask whether St. Francis was investigating a potential sale of the

hospital.  Bradley confirmed that St. Francis was interested in exploring such a

transaction.  Holcombe conveyed CHSPSC's interest to Bradley, and they agreed

to a meeting in January, 2015.

11.

On or around December 16, 2014, St. Francis and CHSPSC executed a Confidentiality Agreement to allow St. Francis to provide CHSPSC with financial and other information about the hospital so that CHSPSC could evaluate a possible acquisition of the hospital by one of CHSPSC's affiliates.

12.

On December 23, 2014, Holcombe and Bradley had another phone call. Holcombe reiterated CHSPSC's interest in St. Francis and provided background on CHSPSC. Bradley discussed the hospital's recent financial troubles, calling the problem simply an accounting error that left the hospital with a cash flow problem, but otherwise operating effectively.

13.

The parties met in person on January 8, 2015, in the board room of St. Francis in Columbus, Georgia. The attendees on behalf of St. Francis included Bradley; St. Francis's CEO Robert Grainger; its CFO, Greg Hembree; its Trustee, Phillip Thayer; and its outside counsel, Michele Madison of the law firm Morris, Manning & Martin, LLP. In addition to Holcombe, CHSPSC was represented by Ken Hawkins, Senior Vice President of Acquisitions and Development. The January 8, 2015 meeting lasted over two hours.

14.

During the meeting, Ken Hawkins from CHSPSC expressly asked St.
Francis's representatives to provide additional information about the hospital's
"accounting mistake."  Among other inquiries, Hawkins specifically inquired
whether St. Francis's need to restate its financials represented merely a financial
weakness, or whether St. Francis also had any significant legal or regulatory
problems.

15.

In response, all of the St. Francis representatives assured CHSPSC that the
hospital's problems were exclusively financial.  St. Francis asserted that the
financial crisis was simply an "accounting error" evidencing incompetent financial
management, and that St. Francis was unaware of any legal or regulatory problem.

### *In fact, HUD had Just Initiated a Legal Investigation of St. Francis*

16.

St. Francis's representations at the January 8 meeting were false.  In fact, St.
Francis faced numerous substantial regulatory and legal problems of which
defendant was aware but failed to disclose to CHSPSC.  Indeed, on January 7,
2015 – the day before the meeting with CHSPSC – the Department of Housing and
Urban Development's ("HUD's") Office of the Inspector General ("OIG") had

informed St. Francis that it had initiated an audit to determine whether St. Francis had violated its regulatory requirements.

17.

An audit by HUD-OIG is a serious regulatory issue that would be material and of central interest to any potential acquirer. HUD is the guarantor of more than $200 million of debt owed by St. Francis. As a result of the audit, HUD could impose a financial penalty, fine, or other punishment on St. Francis critically impairing its relationship with its most important creditor.

18.

An audit by HUD-OIG also implied the strong possibility that St. Francis engaged in fraudulent or otherwise illegal conduct, not simply an erroneous "accounting error" as represented by defendant. Further, it is foreseeable that HUD would refer any audit findings to other government agencies, in particular the Center for Medicare Services ("CMS"), which administers the Medicare program.

19.

Medicare is St. Francis's most significant source of revenue. In response to a HUD audit, CMS could take drastic legal and regulatory action against St. Francis *and any subsequent purchaser of the hospital*, including: (a) offsetting future reimbursement payments to the hospital by the amount of any fines,

penalties, or allegedly fraudulent overpayments; (b) suspending or terminating payments by Medicare to the hospital in light of reasonable indicia of fraud or misconduct; or (c) revoking the hospital's Medicare provider number, thus terminating the hospital's ability to bill Medicare for services.

20.

Accordingly, the HUD audit was of critical importance to CHSPSC's accurate and good faith evaluation of any potential transaction with St. Francis. The HUD audit potentially posed a serious threat to the status of the hospital's Medicare provider number and/or to any future Medicare payments to the hospital. Had CHSPSC learned of the HUD audit in January, 2015, CHSPSC would not have agreed to the terms of the Letter Agreement and would not have advanced the $5 million deposit discussed below.

***St. Francis's Exclusive Negotiations***
***with Piedmont Healthcare End Quickly***

21.

On January 15, 2015, the Columbus Ledger-Enquirer reported that St. Francis had entered exclusive discussions with Piedmont Healthcare, a competitor of CHSPSC, with respect to a possible sale of the hospital.

22.

On January 22, 2015, Holcombe and Bradley had a phone call to discuss this news. Bradley confirmed that St. Francis had entered exclusive negotiations with Piedmont, but stressed that if negotiations with Piedmont failed, St. Francis's "next choice" for a deal would be CHSPSC. Bradley explained that due diligence by Piedmont had begun and that he expected a decision to be made quickly.

23.

On March 3, 2015, Bradley called Holcombe to explain that the St. Francis board had terminated negotiations with Piedmont. Bradley asserted that the Piedmont deal had failed solely because Piedmont was unwilling to assume St. Francis's debt due to the effect such an assumption would have on Piedmont's credit rating. Bradley expressed that St. Francis was interesting in renewing and accelerating negotiations with CHSPSC.

24.

On information and belief, Bradley's representation concerning why Piedmont had withdrawn from negotiations was false. In fact, on information and belief, Piedmont ended negotiations because its due diligence had uncovered St. Francis's many legal problems, including the HUD audit, and Bradley intentionally misrepresented Piedmont's reasons for withdrawing in order to induce CHSPSC to

re-enter negotiations. Had Bradley disclosed the truthful reason Piedmont had withdrawn, CHSPSC would not have executed the Letter Agreement or paid any money to St. Francis.

### *St. Francis Continues to Deceive CHSPSC During Renewed Negotiations*

25.

On March 12, 2015, CHSPSC and St. Francis held a high-level meeting in Columbus, Georgia. The attendees on behalf of St. Francis included Bradley; Thayer; other St. Francis board members; outside counsel Michele Madison; and financial advisor John Bodine. CHSPSC's representatives included CEO Wayne Smith; Ken Hawkins, Senior Vice President of Acquisitions and Development; Bill Hussey, President of Division VI Operations; and Holcombe.

26.

As they did during the January 8, 2015 meeting, CHSPSC's representatives at the March 12 meeting again asked St. Francis to provide more details about St. Francis's "accounting error." Defendant again falsely denied knowledge of any legal or regulatory problems, despite the ongoing HUD audit and other regulatory problems (discussed below).

## 27.

For instance, at the March 12 meeting, Ken Hawkins from CHSPSC specifically inquired (again) whether St. Francis had reason to believe that fraud or theft had occurred and thus whether the hospital faced any legal or regulatory risks. St. Francis's representatives responded in the negative and again falsely stated that St. Francis was unaware of any significant legal or regulatory problems.

## 28.

Bradley, Thayer, Madison and Bodine, along with the other St. Francis representatives at the meeting, all emphasized that the hospital's only issues revolved around "accounting irregularities" and "liquidity." St. Francis intentionally did not disclose the HUD audit or information about the hospital's legal troubles.

## 29.

At the close of the March 12, 2015 meeting, the parties agreed to pursue negotiations in earnest. That same day, CHSPSC provided St. Francis with a detailed list of due diligence materials CHSPSC wished to review to evaluate a potential acquisition. St. Francis agreed to provide access to all responsive documents by uploading them to a "data room" accessible to CHSPSC and its consultants assisting in due diligence, beginning the next day.

1344665.1

30.

Even though the HUD audit was undeniably material to CHSPSC's due diligence and responsive to its due diligence requests, St. Francis intentionally did not upload either the January 7, 2015 HUD-OIG audit letter or any other documents that would disclose the existence of the audit. Nor did St. Francis otherwise disclose the existence of the audit, let alone details about it, until July 14, 2015, as discussed below.

31.

Throughout the remainder of March and the beginning of April, 2015, representatives from CHSPSC and St. Francis regularly communicated about the potential transaction and due diligence. During repeated phone calls, Bradley, Thayer, and other St. Francis representatives explained that the hospital's problems were purely financial and intentionally withheld any information about the audit and other regulatory matters.

32.

For example, on multiple occasions between late-March and April 9, 2015, Eric Roach (CHSPSC's Vice President of Finance) asked Greg Hembree (St. Francis's CFO) to describe in detail St. Francis's relationship with HUD and the substance of recent communications between St. Francis and HUD. Hembree

responded merely that HUD had weekly calls with St. Francis and described communications with HUD while intentionally omitting any mention of the audit.

### *St. Francis and CHSPSC Execute Letter Agreement*

33.

On April 9, 2015, St. Francis and CHSPSC executed a Letter Agreement for CHSPSC's proposed acquisition of St. Francis. The Letter Agreement is attached hereto as Exhibit A.

34.

The Letter Agreement attached a Term Sheet outlining key aspects of the proposed acquisition. The "Good Faith Deposit" term required that at the time of executing the Letter Agreement, CHSPSC would make an "Initial Deposit" of $5 million "to cover St. Francis' cash flow deficiencies." This Initial Deposit was to be applied to the purchase price if the transaction closed. If the transaction did not close, St. Francis was required to return the $5 million to CHSPSC "as a breakup fee" unless CHSPSC terminated the deal without cause. According to the Letter Agreement, none of the provisions in the Term Sheet were binding on the parties except the "Good Faith Deposit."

35.

The Letter Agreement also provided that the parties would maintain the confidentiality of information exchanged during due diligence, and that once CHSPSC paid the Initial Deposit, St. Francis would negotiate exclusively with CHSPSC until June 30, 2015.

36.

CHSPSC timely paid St. Francis the $5 million Initial Deposit upon executing the Letter Agreement on April 9, 2015. Had St. Francis disclosed the existence of the HUD audit or its other significant regulatory exposures, CHSPSC would not have signed the Letter Agreement or advanced St. Francis the $5 million.

### *Despite St. Francis's Continued Misrepresentations, CHSPSC Discovers Numerous Regulatory Violations*

37.

After executing the Letter Agreement, CHSPSC expanded its due diligence efforts. For over three months, the St. Francis transaction occupied the primary attention of dozens of CHSPSC employees. In addition, CHSPSC engaged a number of law firms and financial consultants, at substantial cost, to assist in the process.

38.

During this expanded due diligence period, St. Francis continued to falsely claim that it was unaware of any significant legal issues that might be material to a potential acquisition. In addition, St. Francis repeatedly claimed that it had provided all responsive material, or otherwise resisted providing additional due diligence material, in order to hide the scope of its problems from CHSPSC. St. Francis knew that these representations were false at the time they were made.

39.

For example, on or around April 27, 2015, CHS placed a project CFO, Jeff Mullis, on-site at St. Francis to assist with collecting due diligence materials. After a few weeks, St. Francis began to resist Mullis's requests and to intentionally slow the process of fulfilling them. On information and belief, St. Francis resisted Mullis's efforts out of fear that his inquiries would uncover legal and financial problems St. Francis wanted to hide from CHSPSC.

40.

On May 12, 2015, financial consultant John Bodine e-mailed Ken Hawkins from CHSPSC, expressly and falsely stating that St. Francis saw "no significant [legal] issues" with the hospital.

41.

On May 23, 2015, St. Francis Board Member Phillip Thayer called Bill Hussey (CHSPSC's President of Division VI Operations) to demand that CHSPSC remove Mullis from the hospital. Thayer claimed falsely that Mullis needed to be removed because he was "disruptive." In fact, the real reason St. Francis wanted Mullis gone was because St. Francis was worried he would uncover material facts St. Francis was intentionally hiding from CHSPSC.

42.

Although St. Francis attempted to hide and obfuscate its legal problems, by June, 2015, CHSPSC realized that St. Francis had been potentially violating Medicare and HUD regulations in at least four significant respects for a number of years. In CHSPSC's judgment, these violations were substantial enough to expose St. Francis to tens of millions of dollars in liability in the event of an enforcement action by the government or a private lawsuit by a whistleblower.

43.

Nonetheless, St. Francis had responded to CHSPSC's multiple inquiries both before and after the Letter Agreement by intentionally and repeatedly failing to disclose these serious legal problems. St. Francis deliberately misrepresented the hospital's legal condition because it was desperate for a deal and particularly for

the infusion of cash St. Francis ultimately obtained in the form of the Initial

Deposit. These misrepresentations and intentional omissions were intended to,

and did, induce CHSPSC to execute the Letter Agreement, pay the Initial Deposit,

and continue costly due diligence.

### *St. Francis Continues to Lie About the HUD-OIG Audit*

44.

Although CHSPSC uncovered certain of St. Francis's legal problems by

June, 2015, CHSPSC continued to be unaware of the HUD-OIG audit, because St.

Francis continued to hide it and to lie about its existence.

45.

Immediately after the parties executed the April 9, 2015 Letter Agreement,

CHSPSC assigned Matt Pierce, Senior Director of Compliance, and a number of

Compliance Directors (including Amy Freitas and Ashley Evans) to conduct

detailed due diligence regarding St. Francis's compliance program. Pierce and his

colleagues were charged with collecting materials and information regarding St.

Francis's policies and procedures, internal governance, auditing and monitoring.

46.

On April 20, 2015, Pierce and Freitas had an introductory call regarding this

compliance-related due diligence with Rick Lowe, St. Francis's Compliance and

Chief Operating Officer, and Michele Madison, St. Francis's outside counsel. Pierce outlined a list of materials his team would need St. Francis to provide, specifically mentioning any government investigations and related documents. Madison and Lowe affirmed that they would work to provide these documents.

47.

Madison and Lowe's assurance that they would disclose all compliance-related materials, expressly including any government investigations, was false. At no time did they or anyone else from St. Francis provide CHSPSC with the January 7, 2015 HUD-OIG audit letter or any other information about that audit.

48.

On May 6, 2015, Pierce and his compliance team visited St. Francis for the first time. That morning, they had an initial, in-person meeting with Lowe; outside counsel Madison participated by phone. Lowe described the information St. Francis had placed in the data room, purportedly including all governance and audit reports. Lowe did not disclose that St. Francis had chosen not to provide CHSPSC with the HUD-OIG audit.

49.

During the May 6 meeting, Pierce asked again whether there were any compliance matters, settlement agreements, *or government investigations* St.

Francis had yet to disclose, or any other matters St. Francis thought CHSPSC should know about.  Lowe and Madison both responded falsely that there were no other investigations or audits to provide.

50.

On June 22, 2015, St. Francis's financial consultant Bodine emailed Ken Hawkins from CHSPSC, again stating falsely that St. Francis had provided "all requested information" regarding any "potential [legal or regulatory] exposure items."  Bodine's email further claimed that no one at St. Francis believed the hospital faced any material legal risks.  These claims were knowingly false at the time they were made.

51.

On June 26, 2015, CHSPSC expressly asked St. Francis to provide a detailed update on the status of St. Francis's HUD loans and to summarize all recent communications with HUD.  St. Francis did not respond until providing CHSPSC a written response on July 8, 2015 that omitted mention of the ongoing HUD-OIG audit.

52.

On June 30, 2015, St. Francis, represented by attorney Madison, financial consultant Bodine, and Board Members Bradley and Thayer, traveled to

Brentwood, Tennessee to meet with CHSPSC's leadership regarding the regulatory violations CHSPSC had uncovered, and to discuss how the parties would move forward with the transaction. CHSPSC insisted that no transaction could close unless and until St. Francis voluntarily disclosed the violations to the relevant federal authorities.

53.

Even at this June 30 meeting specifically to address regulatory matters, St. Francis chose not to disclose the ongoing HUD-OIG audit. St. Francis knew that CHSPSC remained unaware of the audit because it had continued to withhold all information about the audit for months, despite repeated requests by CHSPSC that should have led to its disclosure.

54.

At the June 30 meeting, defendant also disclosed that St. Francis would likely have a "liquidity event" by the end of July. Bradley, Thayer, and the other St. Francis representatives implored CHSPSC to provide an additional $3 million deposit, even while St. Francis continued to intentionally hide the HUD-OIG audit.

55.

CHSPSC responded that it would contribute an additional $3 million deposit only if St. Francis made progress on certain due diligence items and exchanged

draft self-disclosures related to the regulatory violations CHSPSC had recently uncovered. CHSPSC also requested that St. Francis extend the exclusivity provisions of the Letter Agreement while due diligence continued. On behalf of St. Francis, Bodine expressly agreed to extend exclusivity for the duration of negotiations.

56.

In sum, St. Francis's repeated denials of the existence of any undisclosed government investigations or regulatory matters were false statements made willfully and intentionally. These false statements were intended to induce, and did induce, CHSPSC to execute the Letter Agreement and pay the Initial Deposit, and then to continue negotiating and conducting due diligence at substantial cost.

***St. Francis Finally Discloses the HUD-OIG Audit, But
Only Because HUD Is About to Issue an Investigation Report***

57.

On July 10, 2015, St. Francis's consultant, John Bodine, called Ken Hawkins and informed CHSPSC of the HUD-OIG audit for the first time. Shocked, Hawkins told Bodine that no one at CHSPSC had previously been told that HUD was engaged in an ongoing audit. Hawkins asked that St. Francis summarize the audit in writing.

58.

Upon information and belief, St. Francis disclosed the audit on July 10 only because St. Francis learned that HUD was about to release its audit report. St. Francis had hoped it could hide the audit until after the transaction had closed entirely.

59.

On July 13, 2015, Deb Cooper and Kevin Howard, in-house legal counsel for CHSPSC, had a call with Michele Madison, St. Francis's outside counsel. Cooper and Howard expressed CHSPSC's deep disappointment that the audit had never before been disclosed, and conveyed that CHSPSC's senior management felt lied to. Madison apologized.

60.

On July 14, 2015, Bodine (St. Francis's consultant) e-mailed Ken Hawkins to ask if a St. Francis Board Member could visit CHSPSC's headquarters to "apologize for all the surprises" that came up in due diligence. Bodine also assured CHSPSC that St. Francis would provide it with a copy of the audit report.

61.

On July 14, 2015, St. Francis uploaded the January 7, 2015 HUD-OIG audit letter to the due diligence data room for the first time. By then, CHSPSC had not

only made the $5 million Initial Deposit, it had spent additional millions of dollars on due diligence, all before learning that a high-stakes regulatory investigation had been ongoing the entire time. The only reason CHSPSC did not know about the audit was defendant's bad-faith, willful, and intentional misrepresentations and omissions.

62.

On July 15, 2015, St. Francis Board Member Paul Todd met with Ken Hawkins and Deb Cooper from CHSPSC. Todd apologized repeatedly for St. Francis's failure to disclose the audit and expressed his "embarrassment" about the information that had been withheld and the "condition" of the hospital.

63.

Despite Bodine's assurance that St. Francis would share a copy of the HUD-OIG audit, St. Francis subsequently retracted this offer, claiming that HUD had advised St. Francis that the audit could not be shared.

64.

In the wake of this new, material information, CHSPSC informed St. Francis on July 20, 2015 that the acquisition could not go forward without assurances from HUD that CHSPSC would not be affected by the investigation, and without other

modifications to the Term Sheet the parties had drafted at a time when St. Francis had hidden material information.

65.

St. Francis responded in a July 21, 2015 letter terminating the Letter Agreement, claiming that the termination was necessary solely because CHSPSC had "modified" the deal.

66.

Since July 21, 2015, St. Francis has rebuffed CHSPSC's repeated demands for return of its Initial Deposit and compensation for the costs CHSPSC incurred in due diligence.

67.

CHSPSC has now learned through press reports that, upon information and belief, St. Francis did not honor the exclusivity or confidentiality clauses of the Letter Agreement, but was instead pursuing parallel negotiations with other potential buyers and sharing confidential information with them.

## COUNT I – FRAUD

### 68.

CHSPSC repeats and realleges paragraphs 1 through 67above as if fully stated herein.

### 69.

During the course of their negotiations, St. Francis and CHSPSC were in a confidential relationship. St. Francis owed CHSPSC a duty to disclose both the HUD-OIG audit and St. Francis's other serious regulatory problems.

### 70.

St. Francis defrauded CHSPSC by making numerous materially false representations about St. Francis, including (1) assuring CHSPSC that the hospital's problems were solely financial, despite knowing of the HUD-OIG audit and the hospital's multiple serious regulatory failures; (2) disclaiming knowledge of any regulatory risks or legal investigations; (3) assuring CHSPSC that St. Francis had provided all material information about St. Francis's relationship and communications with HUD, even though the audit was never disclosed; (4) stating that Piedmont withdrew from the acquisition for credit reasons, when in fact Piedmont withdrew after discovering St. Francis's regulatory non-compliance; (5) failing to disclose the HUD-OIG audit in response to numerous written and

oral requests that reasonably called for disclosure of the audit; (6) assuring CHSPSC that its Initial Deposit would be refunded if the transaction did not close for reasons that were not CHSPSC's fault; and (7) claiming that St. Francis was maintaining exclusivity and confidentiality in accordance with the Letter Agreement.

71.

St. Francis knew that its representations were false when they were made.

72.

St. Francis's purpose in making these misrepresentations was to induce CHSPSC into executing the Letter Agreement, paying the $5 million Initial Deposit, and continuing due diligence and negotiations. St. Francis knew that CHSPSC would consider these misrepresentations material to its decisions on these matters.

73.

CHSPSC reasonably relied on St. Francis's misrepresentations to its detriment. But for St. Francis's false statements and intentional omissions, CHSPSC would not have signed the Letter Agreement, paid the $5 million deposit, or spent any time or money on negotiations or due diligence.

74.

St. Francis's fraud caused CHSPSC substantial damages in an amount to be determined at trial.

75.

In addition, St. Francis's fraudulent and deceitful actions were in bad faith, evidence willful and wanton misconduct, and show a conscious indifference to consequences, rendering defendant liable to CHSPSC for its expenses of litigation as well as additional and punitive damages over and beyond its actual damages.

## COUNT II – BREACH OF CONTRACT

76.

CHSPSC repeats and realleges paragraphs 1 through 75 above as if fully stated herein.

77.

The Letter Agreement is a valid, binding contract between CHSPSC and St. Francis.

78.

St. Francis, and not CHSPSC, terminated the Letter Agreement. Accordingly, the Letter Agreement's "Good Faith Deposit" clause requires St.

Francis to refund CHSPSC's $5 million Initial Deposit. St. Francis has breached the Letter Agreement by refusing to repay the Initial Deposit.

79.

The Letter Agreement precluded St. Francis from exploring a potential sale of the hospital to any prospective buyer other than CHSPSC. In addition, the Letter Agreement required St. Francis to keep confidential any information provided by CHSPSC, including the Term Sheet and any due diligence-related materials.

80.

At the June 30, 2015 meeting, CHSPSC proposed that the exclusivity period be extended for the duration of negotiations. St. Francis subsequently explicitly agreed to that extension. This agreement represents a binding modification to the Letter Agreement.

81.

St. Francis breached the Letter Agreement's exclusivity and confidentiality provisions by actively negotiating with other potential buyers and sharing confidential information during the Letter Agreement's exclusivity period. St. Francis did so with the knowledge that CHSPSC had relied on those provisions of

the Letter Agreement in making its $5 million Initial Deposit and in continuing to spend money and time on due diligence and negotiations.

82.

St. Francis's breach of contract has caused CHSPSC substantial damages in an amount to be determined at trial.

**COUNT III – FEES AND EXPENSES OF LITIGATION**

83.

CHSPSC repeats and realleges paragraphs 1 through 82 above as if fully stated herein.

84.

Defendant's actions toward CHSPSC have been willful, intentional, and in bad faith, and St. Francis's refusal to repay the Initial Deposit, as well as its defense of this litigation, are frivolous, unreasonable, vexatious, and stubbornly litigious.

85.

Accordingly, pursuant to O.C.G.A. §§ 13-6-11 and 9-15-14, 28 U.S.C. § 1927, and as otherwise provided by law, CHSPSC is entitled to recover its attorneys' fees and other reasonable expenses incurred in connection with this litigation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands a jury trial on all claims and prays for judgment as follows:

1.  That the Court enter judgment in favor of CHSPSC and against St. Francis on all counts;

2.  That the Court award CHSPSC all damages incurred, including compensatory damages, punitive damages, and pre-judgment and post-judgment interest, in an amount to be proven at trial;

3.  That the Court award CHSPSC its attorneys' fees and expenses of litigation pursuant to O.C.G.A. §§ 13-6-11 and 9-15-14, 28 U.S.C. § 1927, and as otherwise provided by law;

4.  That all costs be assessed against defendant; and

5.  That the Court award such other and further relief as shall appear just and proper.

This 7th day of August, 2015.

Respectfully submitted,

Edward B. Krugman (admission papers to be filed)
Georgia Bar No. 387016
email: krugman@bmelaw.com
Christopher T. Giovinazzo

Georgia Bar No. 142165
email: giovinazzo@bmelaw.com
John H. Rains
Georgia Bar No. 556052
email: rains@bmelawl.com

**BONDURANT, MIXSON & ELMORE, LLP**
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309
Telephone (404) 881-4100
Facsimile (404) 881-4111

*Attorneys for Plaintiff CHSPSC, LLC*